778 So.2d 944 (2000)
Krishna MAHARAJ, Appellant,
v.
STATE of Florida, Appellee.
No. SC91854.
Supreme Court of Florida.
November 30, 2000.
Rehearing Denied January 23, 2001.
*947 Benedict P. Kuehne of Sale & Kuehne, Miami, Florida; and Clive A. Stafford Smith, New Orleans, Louisiana, for Appellant.
Robert A. Butterworth, Attorney General, and Sandra S. Jaggard, Assistant Attorney General, Miami, Florida, for Appellee.
Chandler R. Muller, Winter Park, Florida, for Members of European Parliament, Amicus Curiae.
Donald R. West of the Law Offices of Donald R. West, Orlando, Florida; and Philip Sapsford, Queen's Counsel, Zubair Ahmad, Barrister, London, for The Bar of England and Wales Human Rights Committee, Amicus Curiae.
James M. Russ of the Law Offices of James M. Russ, P.A., Orlando, Florida; and Julian B. Knowles, Barrister-at-Law, London, for House of Commons, Amicus Curiae.
Sylvia Walbolt of Carlton Fields, St. Petersburg, Florida; and Paul Lomas, Freshfields, London, for Ad Hoc Cross-Party Group of the House of Lords, Amicus Curiae.
PER CURIAM.
We have for review an order from the trial court denying Krishna Maharaj's motion for postconviction relief on the trial phase[1] issues involving his first-degree murder conviction where a sentence of death was imposed. We have jurisdiction pursuant to article V, section 3(b)(1), Florida Constitution. For the reasons expressed below, we affirm the denial of relief and lift the stay entered pertaining to a new penalty phase trial.

PROCEDURAL AND FACTUAL BACKGROUND
Krishna Maharaj (Maharaj) was convicted of two counts of first-degree murder for the deaths of Duane and Derrick Moo Young, two counts of kidnapping, and the unlawful possession of a firearm while engaged in a criminal offense. Maharaj was sentenced to death for the murder of Duane Moo Young and to life imprisonment for the murder of Derrick Moo Young. He was also sentenced to two terms of life imprisonment for the kidnapping convictions and to fifteen years for possession of the firearm, to run consecutively to each of the above sentences. The convictions and death sentence were affirmed on direct appeal. See Maharaj v. State, 597 So.2d 786 (Fla.1992).
Maharaj thereafter filed a motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.851. The motion was summarily denied in the trial court. This Court reversed the summary denial on three issues: (1) whether materials were improperly withheld by the prosecutor; (2) whether counsel was ineffective for failing to properly advise Maharaj on waiver of various issues; and (3) whether perjured testimony was presented at trial by the State. In addition, we also found the trial judge should have recused himself from presiding over the postconviction proceedings because he had been the supervising state attorney during the prosecution of Maharaj. See Maharaj v. State, 684 So.2d 726 (Fla.1996).
The case was assigned to a new judge and hearing was held on the motion. The court denied relief on the issues pertaining to the conviction, but granted relief on the sentencing issue because the trial judge held ex parte communications with the State and allowed the State to write the sentencing order. The court failed to conduct an independent review of the aggravating and mitigating factors by merely adopting the State's order with a few typographical changes. A new penalty phase *948 trial was ordered. Maharaj has appealed that portion of the trial court's decision upholding his conviction. The State did not appeal. This Court stayed the new penalty phase trial pending the outcome of this appeal.
The relevant facts are taken from the direct appeal opinion and are as follows:
These murders occurred as a result of an ongoing dispute between Derrick Moo Young and Krishna Maharaj. Maharaj was arrested after an accomplice of his, Neville Butler, was questioned by the police and inculpated Maharaj.
During the trial, the primary witness for the State was Neville Butler. Butler testified that in June, 1986, he worked for The Caribbean Echo, a weekly newspaper directed to the West Indian community in South Florida. Prior to Butler's employment, the Echo had published an article, in May, 1986, accusing Derrick Moo Young of theft. When Butler joined the Echo, he assisted the publisher, Elsee Carberry, in writing an article in July, 1986, which charged Maharaj with illegally taking money out of Trinidad. Butler testified that on October 10, 1986, an article was published in the Echo accusing Maharaj of forging a $243,000 check. This article explained that the check was the basis for a lawsuit that Moo Young had filed against Maharaj.
Butler testified that in September, 1986, he was unhappy working for the Echo and contacted Maharaj seeking employment with The Caribbean Times, Maharaj's newspaper. Butler testified that, at Maharaj's urging, he arranged for a meeting between Derrick Moo Young and Maharaj at the DuPont Plaza Hotel in Miami so that Maharaj could extract a confession from Moo Young regarding his extortion of $160,000 from Maharaj's relatives in Trinidad. Butler arranged this meeting for October 16, 1986, using the pretext of a business meeting with some Bahamian individuals named Dames and Ellis, who were interested in importing and exporting certain products. Butler arranged to use Dames' suite at the hotel. Butler stated that Maharaj made it clear that he should not tell Moo Young that he would be at the meeting.
According to Butler, Maharaj wanted to (1) extract a confession of fraudulent activity from Derrick Moo Young, (2) require Moo Young to issue two checks to repay him for the fraud, and (3) have Butler go to the bank with the checks to certify them, at which time Maharaj would allow Moo Young to leave upon hearing of the certification. Butler stated that Derrick Moo Young and, unexpectedly, Duane Moo Young, his son, appeared at the hotel room. Once inside, Maharaj appeared from behind a door with a gun and a small pillow. An argument broke out between Maharaj and [Derrick] Moo Young over the money owed. Maharaj shot Derrick Moo Young in the leg. At that time, Derrick Moo Young attempted to leave. Maharaj ordered Butler to tie up Duane Moo Young with immersion cords. Maharaj also ordered Butler to tie up Derrick Moo Young; however, before he could do so, Derrick Moo Young lunged at Maharaj. Maharaj fired three or four shots at Derrick Moo Young.
After shooting Derrick Moo Young, Maharaj questioned Duane Moo Young regarding the money. During this time, Derrick Moo Young crawled out the door and into the hallway. Maharaj shot him and pulled him back into the room. Shortly thereafter, Duane Moo Young broke loose and hurled himself at Maharaj, but Butler held him back. Then Maharaj took Duane Moo Young to the second floor of the suite where he questioned him again. Later, Butler heard one shot. Maharaj came downstairs and both he and Butler left the room. They both waited in the car in front of the hotel for Dames.
Sometime later, Butler met with Dames and Ellis, the two men he used *949 to lure Moo Young to the hotel. They encouraged him to tell the police what he knew of the murders. Later that day, Maharaj called Butler asking that he meet him at Denny's by the airport so they could make sure and get their stories straight. Butler called Detective Burmeister and told him what had transpired earlier that day in suite 1215 of the DuPont Plaza Hotel. The detective, along with another officer, drove Butler to Denny's to meet Maharaj and, at a prearranged signal, the detectives arrested Maharaj.
. . . .
The State presented other corroborating evidence concerning the events that took place at the DuPont Plaza Hotel. The maid assigned to this room testified that she cleaned the room in the early morning of October 16, 1986, and, upon entering it, found that it had not been used the previous evening. She also explained that, when she left the room, it was in perfect order, including the fact that the "Do Not Disturb" sign was on the inside of the door. At 12:15 p.m., she and her boss were asked to check the room. They attempted to enter the room but were unable to do so because it was locked from the inside and, consequently, the master key would not work. She explained that the room could not be locked from the inside unless someone was in the room. Ten minutes later, she returned with a security guard, and they noticed that the "Do Not Disturb" sign was hanging on the doorknob. This time when she tried the master key, it worked; she opened the door and, upon entering the room, noticed that the furniture had been moved and that there were two bodies.
A police fingerprint expert testified that he found Maharaj's prints on: (1) the "Do Not Disturb" sign attached to the exterior doorknob of suite 1215; (2) the exterior surface of the entrance door; (3) the outer surface of the downstairs bathroom; (4) the top surface of the desk; (5) an empty soda can; (6) the telephone receiver; (7) the top of the television set; (8) a glass table top; (9) a plastic cup; (10) the Miami News newspaper; (11) a U.S.A. Today newspaper; and (12) torn packages that held immersion heaters. Butler's prints were also found on a plastic glass, the telephone, the desk, the front door, and the television set.
The State presented a firearms expert, who examined the spent projectiles and casings. The expert testified that the eight bullets fired were from a pre-1976 Smith & Wesson model 39, a nine-millimeter semiautomatic pistol with a serial number under 270000. Evidence in the record established that Maharaj owned a Smith & Wesson nine-millimeter pistol, having a serial number of A235464.
The State also presented the testimony of the medical examiner, who stated that Derrick Moo Young had six gunshot wounds, the most serious of which entered the right side of the chest and exited the lower back. There was only one gunshot wound in Duane Moo Young, and it entered the left side of the face and exited the right side of the neck, having been fired at close range within up to six inches between the wound and the barrel. The medical examiner found that this wound was consistent with Moo Young's kneeling or sitting with his head close to and facing the wall of the room.
During the course of the State's case, the chief judge of the criminal division announced that the judge who had been presiding over the trial would not be able to continue. Counsel for Maharaj stated that he would make no motion for mistrial. The newly assigned judge questioned Maharaj as to whether he desired a mistrial, to which Maharaj responded that he wished to proceed. The new trial judge certified that he had read the testimony of the previous witnesses and proceeded with the trial.

*950 The defense did not present any witnesses in the guilt phase of the trial. After deliberations, the jury found Maharaj guilty as to each of the offenses charged except armed burglary and aggravated assault.
Maharaj, 597 So.2d at 786.
Maharaj raises the following five issues in this postconviction appeal: (1) whether the combined effects of judicial misconduct shatter confidence in this conviction; (2) whether Maharaj was denied a fair postconviction hearing because he was denied funding; (3) whether the cumulative effect of all the errors in this case require the indictment be dismissed or a new trial granted; (4) whether the State failed to comply with its obligation to Maharaj under international law; and (5) whether the cumulative errors require the Court to dismiss the indictment rather than reverse the conviction. Under each of these issues the defendant has listed a number of subissues, many of which are discussed as a part of each issue. For the sake of clarity, the discussions will be divided into the major categories of alleged bribery solicitation, judicial misconduct, funding issues, alleged Brady violations, perjured testimony, ineffective assistance of counsel, discovery requests, and international law claims. For the reasons that follow, we find no reversible error in any of these claims.

Alleged Bribery Solicitation
Judge Gross, the presiding judge during the first part of Maharaj's trial, was arrested on bribery charges in a separate case.[2] Maharaj told his attorney prior to trial that a woman, known by Maharaj's counsel to be an assistant state attorney, had approached him. According to Maharaj, the assistant state attorney told Maharaj that she had a special relationship with Judge Gross. She assured Maharaj he would be released on bond if he paid her $50,000. There is no other evidence in the record linking Judge Gross to this solicitation.
After Judge Gross was arrested, the presiding judge offered to grant Maharaj a mistrial because Judge Gross would no longer be presiding in the case. Maharaj declined the offer. Maharaj's counsel testified in the hearing below that he made a strategic decision when he advised Maharaj not to accept the judge's offer for a mistrial because he was happy with the jury and the way things were going up to that point in the trial. He also testified that he thought the arrest of the judge might help his case because it supported his theory of defense by showing the jury that the legal system was fallible.
Maharaj argues several points of error with regard to the alleged bribery solicitation by Judge Gross. To the extent that Maharaj argues any error in the trial court's failure to declare a mistrial after Judge Gross was arrested, such a claim is procedurally barred since it was raised and determined on the merits on direct appeal. See Maharaj, 597 So.2d at 790; see also Johnson v. State, 593 So.2d 206 (Fla.1992) (holding issues that could have been raised on direct appeal are procedurally barred). As for the other issues concerning the alleged bribery solicitation by the first trial judge, we find no reversible error.
The issues presented here concerning the alleged solicitation of a bribe, e.g., that the original trial judge should have recused himself, that counsel was ineffective for failing to connect the actions of the assistant state attorney with the arrest of Judge Gross for bribery, etc.[3] are, as the defendant suggests, so interrelated that *951 they will be discussed together and not as distinct and discrete subparts. The majority of Maharaj's allegations on this issue involve the effectiveness of counsel. In Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the United States Supreme Court enunciated the standard to be applied to ineffective assistance of counsel claims, stating:
A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.
Id. at 687, 104 S.Ct. 2052. In Medina v. State, 573 So.2d 293, 297 (Fla.1990), this Court recognized that counsel cannot be ineffective for strategic decisions made during a trial. Under these standards, Maharaj has failed to demonstrate ineffective assistance of counsel.
Counsel testified at the hearing below that he advised Maharaj to waive his right to a mistrial because he was happy with the jury that had been chosen and the way the State's main witness had testified. Counsel feared the State would better prepare its main witness for a subsequent trial and that his testimony could be much more damaging. In addition, counsel felt having Judge Gross arrested during the trial supported his contention that the legal system was not infallible. Maharaj did not testify at the hearing and did not present any evidence to rebut counsel's testimony that the decision not to move for a mistrial was strategic. Accordingly, this claim is without merit because counsel acted with a strategic purpose. See Medina, 573 So.2d at 297-98.
Maharaj also argues counsel was ineffective for not moving to have Judge Gross recused prior to trial when counsel was informed that the judge had solicited a bribe. This argument assumes facts that have not been proven. The record reflects Maharaj was approached by an assistant state attorney who was leaving the state attorney's office to go into private practice.[4] The alleged bribery solicitation consisted of the assistant state attorney telling Maharaj she had a good relationship with Judge Gross, and if he gave her a $50,000 retainer she would be able to make sure he received a bond. Counsel knew the woman who had approached Maharaj and thought she worked for the State. However, after discussing the matter with the State, counsel concluded the assistant state attorney was going into private practice and was probably trying to steal his client. Counsel testified that he did not think the contact between the assistant state attorney and Maharaj was a bribery solicitation or that Judge Gross was involved. In fact, there is no indication in the exchange between Maharaj and the assistant state attorney that this contact was made on behalf of Judge Gross or with his knowledge and consent. No other witnesses were called to link this attorney's action with the judge. Any contrary conclusion is sheer speculation based on the action of Judge Gross in another case. Postconviction relief cannot be based on speculation or possibility. Accordingly, counsel was not ineffective because Maharaj has failed to demonstrate that competent *952 counsel, without more evidence, would have acted differently. See Strickland, 466 U.S. at 668, 104 S.Ct. 2052.
Maharaj further alleges counsel was ineffective for failing to connect the alleged bribery solicitation to Judge Gross after he was arrested for bribery in a separate case. This claim is also without merit. The fact that an attorney uses an alleged relationship with a judge as a bargaining chip to gain clients or for monetary gain does not demonstrate any involvement on the part of the judge. Even in these postconviction proceedings, there has been no linkage of this attorney's solicitation of Maharaj to Judge Gross. The fact that the judge was arrested and charged in another case does not demonstrate his involvement in this particular matter. There is simply no proof offered in this case that Judge Gross solicited a bribe from Maharaj. As a consequence, Maharaj has failed to demonstrate he was denied a fair trial due to counsel's allegedly ineffective performance. See Strickland, 466 U.S. at 668, 104 S.Ct. 2052.
Additionally, Maharaj's claim that the trial judge should have recused himself from this case rests on the same faulty premise, that is, that the trial judge in fact solicited a bribe. Viewing the evidence in this record in a light most favorable to the defendant demonstrates that an attorney solicited money from the defendant. During the course of that solicitation, the attorney indicated that she could arrange a bond for the defendant based on her, the attorney's, relationship with the judge. This statement can be interpreted in a variety of ways. To say that this contact was made for or at the behest of the judge is a serious allegation. Such a serious allegation must be demonstrated and cannot be left to surmise from differing interpretations. Maharaj has not demonstrated that Judge Gross was in fact involved in a bribery solicitation in this case. We cannot base our conclusions on such a serious matter on the fact that the judge was involved in bribery in some other matter.
On this record, Maharaj has failed to demonstrate reversible error.

Other Instances of Judicial Impropriety
Maharaj next argues he is entitled to postconviction relief because the second trial judge had the State write the sentencing order and because the first postconviction judge was the attorney supervising Maharaj's prosecution. Maharaj received adequate relief for both of these claims. This Court reversed the summary denial of postconviction relief and remanded the case for an evidentiary hearing before a new judge. See Maharaj v. State, 684 So.2d 726 (Fla.1996). A new judge was appointed, an evidentiary hearing was conducted, and a new penalty phase trial has been ordered based on the second trial judge's failure to independently weigh the aggravating and mitigating factors. Adequate relief has been granted to this defendant.

Lack of Adequate Funding
Maharaj claims he was denied a full and fair postconviction hearing because he did not have adequate funding to investigate and depose witnesses. This claim is without merit for several reasons. See Remeta v. State, 710 So.2d 543 (Fla. 1998).
Maharaj filed a motion to incur costs with the trial court. The trial court and the defense determined that pursuant to Hoffman v. Haddock, 695 So.2d 682 (Fla. 1997), the county was not responsible for such costs. Therefore, the trial court denied the request to assess costs to the county but referred the matter to Judge Schaeffer, as chair of the Justice Administrative Commission, for consideration. Judge Schaeffer reviewed the request for funds and questioned some of the items, including out-of-state experts. Later it was determined that Maharaj was not eligible for funds from this source because those funds were reserved for cases where the Office of the Capital Collateral Representative (CCR) had a conflict. Maharaj was never represented by CCR; Maharaj's *953 postconviction attorneys were privately retained. Once that source was determined to be unavailable to Maharaj, the trial court informed Maharaj that he should apply to CCR for funding. CCR told him there were no funds available until October. The judge offered to stay the proceedings until October, but Maharaj insisted on going forward with the hearing. Maharaj claims he was never guaranteed funding in October and that he felt certain he would have been denied funding at that time. Therefore, he argues he did not waive his right to adequate funding by not having the hearing continued. We disagree.
While the trial court expressed uncertainty on the future availability of funding, this was basically the situation with all capital postconviction defendants during this period. The CCR offices were undergoing substantial changes,[5] including funding problems. Had Maharaj's attorneys chosen to continue his hearing until October and funds had not been forthcoming, he would have a better argument before this Court on this issue. As matters now stand, postconviction counsel, for strategic or other reasons, chose to proceed without the funds being available. Thus, Maharaj was not denied adequate funding; he made a decision to proceed before the Capital Collateral Regional Counsel (CCRC) offices were organized and could deal with funding requests.
Additionally, in Remeta, this Court held that claims of insufficient postconviction funding require the defendant to demonstrate the evidence could not have been obtained through due diligence at the time of trial. See 710 So.2d at 546. Here, Maharaj has failed to show why the witnesses he wished to present at the hearing were not presented. Maharaj was not declared indigent during his trial; therefore, insufficient funding did not prevent these witnesses from being called at that time.

Brady Violations
Maharaj also alleges the State withheld exculpatory evidence which resulted in a denial of a fair trial.[6]See Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The recent cases from both this Court and the United States Supreme Court indicate that a defendant must demonstrate the following elements before a Brady violation has been proven: (1) the evidence at issue is favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) the evidence has been suppressed by the State, either wilfully or inadvertently; and (3) prejudice to the defendant has ensued. See Way v. State, 760 So.2d 903 (Fla.2000); Thompson v. State, 759 So.2d 650 (Fla.2000). See also Strickler v. Greene, 527 U.S. 263, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). The prejudice prong is determined by examining "whether `the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" Strickler v. Greene, 527 U.S. at 290, 119 S.Ct. 1936 (quoting Kyles v. Whitley). Maharaj has failed to meet his burden of proof on each of the alleged Brady violations.
Maharaj first alleges the State withheld evidence that the victims had recently purchased large life insurance policies. There has also been no showing that the fact of the insurance policies was exculpatory. Evidence is exculpatory if it is favorable to the defendant and tends to negate the guilt of the accused or tends to negate the punishment. See Hunter v. *954 State, 660 So.2d 244 (Fla.1995); Doyle v. State, 460 So.2d 353 (Fla.1984). Although this information is interesting, there has been no showing of its materiality, that is, there has been no showing that this evidence tends to negate the conviction or the sentence. More importantly, this information cannot reasonably be said to put the case in such a different light as to undermine confidence in this verdict. See Strickler v. Greene, 527 U.S. at 290, 119 S.Ct. 1936. We agree with the court below and find there was no Brady violation by the State's failure to disclose the victims' life insurance policies.
Maharaj next alleges that the State violated Brady by suppressing the information found in the victims' briefcase. The lower court rejected this claim, stating:
Regarding the passports and papers and notes contained in a brief case belonging to the victims found at the crime scene, the record shows that trial counsel was aware of these items before and during trial. Specifically, the passports describe foreign travel by the victims from the United States to Panama, Jamaica and other countries. The notes and papers pertain to International letters of credit, appointments, insurance policies on the victims, possible involvement in the commission of fraud and other information.
The court finds that trial counsel deposed the lead detective regarding this evidence. Counsel should and could have moved to compel the production of these items but did not do so. His private investigator attempted to inspect this evidence at the Miami Police Department, but was told that the evidence had been returned to the victims' family. The court finds that the evidence would not have impeached the testimony of the State key witness Neville Butler nor would it have resulted in a markedly weaker case for the prosecution and a markedly strong one for the defendant.
We agree with the trial court's assessment of this issue.
The trial court in essence found this evidence does not fall in the category of Brady material because it does not meet the materiality prong of the test and because both the prosecutor and the defense were aware of the information. This Court recently addressed a similar situation involving notes about possible witnesses in Occhicone v. State, 768 So.2d 1037, 1042 (Fla.2000). In addressing the fact that the defendant was aware of these witnesses, we said:
Although the "due diligence" requirement is absent from the Supreme Court's most recent formulation of the Brady test, it continues to follow that a Brady claim cannot stand if a defendant knew of the evidence allegedly withheld or had possession of it, simply because the evidence cannot then be found to have been withheld from the defendant.
Maharaj was aware of this material since his investigator testified that he attempted to get the contents of the briefcase and was told they had been returned to the victims' family. Maharaj was aware of the location of the contents of the briefcase and could have compelled the production of the document by requesting a subpoena duces tecum. There is no Brady violation in this situation because the evidence cannot be found to have been withheld from the defendant. See Occhicone v. State, 768 So.2d at 1042. Additionally, as the trial court said, this evidence would not have impeached the testimony of Neville Butler.
Next, Maharaj alleges the State withheld evidence that Dames had called Derrick Moo Young to set up the meeting at the DuPont Plaza Hotel. This allegation is based on a letter from an insurance investigator which was not in the possession of the State. There can be no Brady violation when the allegedly suppressed evidence is not in the possession of the State.[7]
*955 Maharaj also alleges the State withheld evidence that Butler failed his polygraph examination. This claim is without merit because it is abundantly clear from this Court's opinion on direct appeal that the defense was aware of Butler's performance on the polygraph examination. See Maharaj v. State, 597 So.2d at 790. The defense argued it was error to exclude evidence that Butler failed the polygraph and that this failure was relevant to Butler's credibility. We denied relief on that claim without discussion. Thus, to the extent Maharaj claims evidence was withheld, that issue is refuted by the record. Since the defense had knowledge of the polygraph results, there is no Brady violation.
Furthermore, Butler did not fail the polygraph. In fact, the polygraph report shows that of the eleven questions asked, Butler was only found to be deceptive regarding one. The one deceptive answer was in response to a query involving whether he had stayed in a car with Maharaj for two hours after the shooting. The answers to two other questions were found to be inconclusive. These questions concerned whether he knew that the victims were to be shot before the meeting and whether he was telling the complete truth about the incident. Butler's responses to the remaining questions, which concerned having actually witnessed Maharaj shooting the victims, having not been armed, and drugs not being involved in the crime, were indicative of truthfulness. The State sent a letter to Maharaj stating that Butler passed the polygraph, but that some of his answers had changed since the time he was deposed. The letter invited Maharaj to redepose Butler, which he did. The prosecutors testified that Butler's answers to the questions which they considered to be crucial were truthful; therefore, they believed he had indeed passed the polygraph test. Thus, Maharaj has failed to show Butler failed the polygraph or, even assuming failing one question of tangential significance constituted failing the polygraph, that the State withheld material information.
Maharaj also alleges the State withheld a memo that could have been used to impeach Carberry, the editor of The Carribean Echo. The memo discusses Carberry's possible involvement in various fraud schemes and his illegal presence in the United States. Carberry's trial testimony focused on the articles that appeared in his newspaper concerning the defendant and the victims. It is undeniably true that the articles were in fact published in Carberry's newspaper. Both the reputation of the newspaper and Carberry individually were substantially impeached during Carberry's testimony and during the testimony of Butler and Geddes. The jury was well aware of the surly reputation of both Carberry and the newspaper he ran. Maharaj has not demonstrated that this impeachment evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Strickler, 527 U.S. at 290, 119 S.Ct. 1936.
Next, Maharaj alleges the State withheld evidence that he had made a prior statement to police that his gun had been taken during a traffic stop. This issue was litigated at trial and the State presented witnesses who testified Maharaj's gun was not taken during the traffic stop. There is no viable Brady issue involved here since the defense was aware of this information.
The defendant also claims the State suppressed evidence that two other people named Maharaj had Smith & Wesson guns. There is no Brady violation here because this evidence is not material or relevant, and it cannot reasonably be said that this evidence puts the case in such a different light as to undermine our *956 confidence in the verdict. This information was not relevant because the two people Maharaj claims he should have been notified of both possessed .38 caliber guns, rather than .9 millimeter guns. The only expert testimony in the record was that the victims were shot with a .9 millimeter gun.[8] This claim is without merit.
Maharaj claims the state withheld evidence that he invoked his right to remain silent. He claims this information would have allowed counsel to suppress Maharaj's statement to Detective Buhrmaster that he had never been in room 1215 of the DuPont Plaza Hotel. Maharaj demonstrated at the hearing that at some point after he had been in custody for four days the police came to see him and he invoked his right to counsel. Because this invocation of rights was done four days after his arrest, it did not affect the validity of statements made prior to that time, including the statement concerning his presence in room 1215. Any failure to disclose this information was not material to the issue of the defendant's presence in room 1215.
For all of the reasons expressed above Maharaj is not entitled to relief on this claims involving Brady violations.

Perjured Testimony
Maharaj alleges the State presented the perjured testimony of several witnesses. In order to prove the State presented perjured testimony, Maharaj must show: "(1) that the testimony was false; (2) that the prosecutor knew the testimony was false; and (3) that the statement was material." Routly v. State, 590 So.2d 397, 400 (Fla.1991). To demonstrate perjury, Maharaj must also show more than mere inconsistencies. See United States v. Bailey, 123 F.3d 1381, 1395-96 (11th Cir.1997) (holding proof of perjury requires more than showing of mere memory lapse, unintentional error, or oversight); United States v. Michael, 17 F.3d 1383, 1385 (11th Cir.1994) (finding conflicts in testimony are insufficient to show perjury); United States v. Lochmondy, 890 F.2d 817, 822 (6th Cir.1989). Maharaj has failed to meet this standard of proof on the perjury allegations.
Shaula Nagel, Derrick Moo Young's daughter, testified at trial concerning various issues surrounding her father, including some of his business dealings. The defense now alleges, based on a deposition taken during a civil suit, that the testimony given at Maharaj's trial was untrue and that the State knowingly used this perjured testimony. Not only is this allegation based upon minor inconsistencies between Nagel's testimony in the civil suit concerning the Moo Youngs' life insurance policies, but this issue is also meritless because the civil proceedings were conducted after the criminal trial. Therefore, there is no basis to conclude the State was aware of these inconsistencies when Nagel testified at Maharaj's trial. Thus, the claim that the State presented the perjured testimony of Shaula Nagel is without merit.[9]
Maharaj further argues the State suborned perjury regarding why Butler changed his testimony. He argues Butler lied when he told the jury he had changed his testimony about what had transpired because of an act of conscience. This allegation is refuted by the fact that the prosecutor informed defense counsel that Butler had made changes to his testimony both before and after the polygraph examination. The prosecutor indicated the defendant had been confronted with some contradictory evidence. At the prosecutor's *957 prompting, Butler was redeposed by defense counsel.
We deny this Giglio[10] claim because the defendant has failed to demonstrate that the statement was false or that the statement was material. While the statement concerning an act of conscience may not be entirely true, there has been no showing that it was entirely false. The prosecutors testified at the evidentiary hearing that Butler voluntarily appeared at their office after being told that the State wanted to question him about some of his testimony. He was not given immunity and changes were made to the testimony prior to the polygraph. Neither prosecutor indicated that Butler changed any testimony as a result of the polygraph examination. The State opined Butler may have considered his change of testimony voluntary because he voluntarily appeared for further questioning.
Based on this record, the State did not suborn perjury. See Routly, 590 So.2d at 400. Furthermore, after viewing the entirety of Butler's testimony, we find there is no reasonable probability that the failure to clarify the statement made by Butler affected the jury's verdict.

Ineffective Assistance of Counsel
Maharaj also claims his trial counsel was ineffective with regard to several issues. Allegations involving competency of counsel must be analyzed under the two-pronged standard enunciated by the Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). This standard requires a defendant to show both that counsel's performance fell short of that required of competent counsel and that counsel's deficient performance resulted in a trial which cannot be relied upon. Maharaj has not demonstrated that there has been a breakdown in the adversarial process. First, he claims counsel was ineffective for failing to properly impeach Butler at trial based upon inconsistent statements contained in his first statement to the police. This claim has not been demonstrated because counsel did impeach Butler with his prior inconsistent statement. Failure to present cumulative evidence is not ineffective assistance of counsel. See Valle v. State, 705 So.2d 1331 (Fla.1997); Provenzano v. Dugger, 561 So.2d 541 (Fla. 1990); Glock v. Dugger, 537 So.2d 99 (Fla. 1989); Card v. State, 497 So.2d 1169 (Fla. 1986).
Next, Maharaj argues counsel was ineffective for failing to object to the admissibility of the newspaper articles. This issue was addressed on direct appeal and is procedurally barred. See Maharaj, 597 So.2d at 790 (finding this claim meritless because the articles were relevant to show Maharaj's motivation in harming Derrick Moo Young). As we previously held, the newspaper articles were admissible to show motive. Maharaj met with Carberry, the editor of the newspaper, and had a full-page article published concerning the Moo Youngs' activities. Thereafter, the Moo Youngs had a series of articles published about the defendant. These articles, whether true or false, clearly demonstrate animus between the defendant and the decedents.
Maharaj next asserts counsel was ineffective for advising him not to testify and thus his subsequent waiver of the right was invalid. Maharaj claims that counsel based his advice not to testify on the fact that Maharaj would have been cross-examined on the articles and that effective counsel would have encouraged him to testify because the articles were false. The lower court properly rejected this claim, stating:
Further, counsel testified that the defendant asked him for his opinion regarding defendant testifying at trial, and they discussed the strengths and weaknesses of the case. Counsel stated that he advised the defendant against testifying because of the introduction in evidence *958 of the newspaper articles that provided a motive for the murders and the issue of defendant's character. Counsel stated that ultimately it was the defendant who decided that he did not want to testify. Counsel stated that he reviewed with the defendant the waiver colloquy that the court would address with him. The Court finds that this claim is without merit.
Maharaj now claims that he would have testified had counsel's advice been different.
The defendant did not testify at the evidentiary hearing nor did he proffer any proposed testimony which would have shown the articles to be false or why that fact would have changed his decision. More importantly, even assuming the falsity of the articles, Maharaj does not negate the fact that he would have been cross-examined on whether the articles made him angry, which is the reason they were relevant. The defense has failed to demonstrate deficient performance and prejudice under Strickland.
Maharaj next alleges that counsel was ineffective for failing to present the testimony of Manuelos Stavros. Maharaj claims Manuelos Stavros would have testified that Maharaj told him the gun was taken in a traffic stop prior to the accident. Counsel investigated this testimony prior to trial; however, Stavros' statement at the time was that Maharaj had complained of money being taken, not a gun. Given the content of Stavros' pretrial statement, counsel was not ineffective for failing to present testimony that would not have supported Maharaj's theory of defense.
Next, Maharaj makes several allegations that counsel was ineffective for failing to investigate,[11] depose, and effectively impeach Tino Geddes. This claim is without merit as counsel did depose Geddes and there were no significant inconsistencies which would have affected the outcome of the case. Moreover, counsel repeatedly questioned Geddes about the credibility of his stories during the trial, and he repeatedly argued the veracity of Geddes' allegations to the jury during his two-hour closing argument. Accordingly, this claim is without merit as counsel's performance did not fall measurably below that of competent counsel.
Maharaj next asserts counsel was ineffective for not introducing Detective Romero's testimony to impeach Detective Buhrmaster's testimony regarding Maharaj's statement to the police at the time of his arrest. Counsel cannot be deemed ineffective for failing to raise a nonmeritorious issue. See Kokal v. Dugger, 718 So.2d 138 (Fla.1998); Groover v. Singletary, 656 So.2d 424 (Fla.1995); Hildwin v. Dugger, 654 So.2d 107 (Fla.1995); Breedlove v. Singletary, 595 So.2d 8, 11 (Fla.1992). Maharaj attempts to make Romero's testimony regarding what Buhrmaster reported about Maharaj's statement inconsistent by implying Buhrmaster told Romero that Maharaj had admitted being in room 1215. However, in his pretrial deposition, Romero clarified that Buhrmaster had never indicated Maharaj admitted to being in room 1215. Buhrmaster told Romero that Maharaj admitted being "there." Romero did not know whether "there" meant there at the hotel or there in room 1215. This statement was consistent with Buhrmaster's trial testimony that Maharaj admitted to being at the hotel the morning of the murders but denied going inside or ever being in the room. As the statements were consistent, Romero's testimony would not have impeached Buhrmaster's testimony. See Morton v. State, 689 So.2d 259, 262 (Fla.1997) (holding to be admissible as impeachment, statement must be inconsistent). *959 Accordingly, counsel was not ineffective for failing to present this evidence.
Next, Maharaj alleges counsel was ineffective for failing to file a pretrial motion challenging Maharaj's identification as the person who reserved the hotel room. The trial court denied relief on this claim finding the decision not to file a motion to suppress identification was a strategic one. This ruling is supported by the testimony of defense counsel at the evidentiary hearing. Counsel's strategic decisions, viewed from the vantage of 20-20 hindsight, do not demonstrate ineffective assistance. See Strickland, 466 U.S. at 687, 104 S.Ct. 2052.
Lastly, we find no merit in Maharaj's allegation that counsel was ineffective because he failed to properly investigate and present alibi witnesses. Counsel testified that he obtained a list of potential alibi witnesses. Affidavits of these witnesses were obtained. Counsel personally spoke to some of the witnesses and evaluated their testimony. Counsel found the alibi witnesses not credible, and he made a strategic decision not to present them after the State presented evidence of an attempt by Maharaj to fabricate an alibi.[12] Counsel cannot be ineffective for strategic decisions made during a trial. See Medina v. State, 573 So.2d 293, 297 (Fla.1990).
For all of these reasons we find counsel was not ineffective.

Denial of Discovery Request
We reject Maharaj's claims he was entitled to have access to the grand jury transcripts to determine if Butler had testified inconsistently at trial.[13] Maharaj was aware Butler had changed his testimony between the time he testified before the grand jury and the time of trial. Thus, there were no inconsistencies that were hidden from him. Moreover, the judge reviewed the grand jury transcripts in camera and found only minor inconsistencies between his grand jury and trial testimony. Accordingly, Maharaj was not entitled to the transcripts. See Keen v. State, 639 So.2d 597 (Fla.1994).

International Law
Finally, Maharaj alleges the State failed to comply with its international obligation to inform the British Consul that a British citizen had been charged with a capital crime, as required under the Vienna Convention and the Bilateral Consular Convention between the United States and the United Kingdom. However, this is an issue which could have and should have been raised on direct appeal. Since Maharaj did not timely pursue the issue, it is procedurally barred. See Francis v. Barton, 581 So.2d 583 (Fla.1991). Additionally, he has failed to establish that he has standing, as treaties are between countries, not citizens. See Matta-Ballesteros v. Henman, 896 F.2d 255 (7th Cir.1990).

Conclusion
For the reasons stated above, we affirm the trial court's denial of relief as to the guilt phase of Maharaj's capital murder trial. The stay entered is hereby lifted, and we remand this case to the trial court for a new penalty phase trial.
It is so ordered.
WELLS, C.J., and SHAW, HARDING, LEWIS and QUINCE, JJ., concur.
ANSTEAD and PARIENTE, JJ., concur in result only.
NOTES
[1] The trial court granted relief on the penalty phase and ordered a new penalty proceeding.
[2] Judge Gross was arrested three days into Maharaj's trial.
[3] The subissues alleged under the umbrella of the bribery solicitation issue are: (1) Judge Gross should have recused himself because he solicited a bribe from the defendant; (2) counsel was ineffective for failing to file a motion to recuse Judge Gross after he discovered the bribery solicitation; (3) counsel was ineffective for failing to move for a mistrial and for advising Maharaj not to ask for a mistrial after Judge Gross was arrested.
[4] In fact, the contact between the assistant state attorney and Maharaj occurred three days before she left the state attorney's office.
[5] The central office was divided into three regional offices, Capital Collateral Regional Counsel (CCRC) North, Middle and South, and a director for each of those offices was needed.
[6] Maharaj alleges numerous Brady claims, claims of perjured testimony and ineffective assistance of counsel. Any claim not specifically addressed is hereby denied.
[7] The defense was aware that Dames was involved with Butler, Ellis, and the Moo Youngs. Butler testified he set up a meeting between Maharaj and Derrick Moo Young, using Dames' name to lure Moo Young to the hotel. He also testified Dames was aware of the meeting and agreed to let Butler use his name. Butler was deposed by defense counsel who should have known of the substance of his testimony prior to trial.
[8] The defense had a ballistics expert examine the gun but he was not used as a witness at the evidentiary hearing.
[9] In his reply brief Maharaj argued Nagel's testimony in the civil proceeding could also be viewed as newly discovered evidence. This claim is without merit because he has failed to show how any of the alleged inconsistencies would have a reasonable probability of producing an acquittal on retrial. See Jones v. State, 591 So.2d 911 (Fla.1991).
[10] Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).
[11] Maharaj argues counsel was ineffective for failing to investigate Adam Hosein and Jamie Majais for possible involvement in these murders. Since defense counsel testified at the evidentiary hearing that he investigated these persons but could not connect them to the events surrounding these murders, this claim of ineffective assistance will not be discussed further.
[12] It appears counsel was correct in his evaluation of the alibi witnesses. Tino Geddes, one of the alibi witnesses, recanted his alibi testimony and testified for the State.
[13] Maharaj challenges a number of rulings made by the trial judge at the evidentiary hearing. We find no reversible error in these rulings. While a defendant is generally allowed great latitude in the presentation of evidence at postconviction hearings, the defendant is still bound by the rules of evidence regarding materiality and relevancy.